## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**CATHY T.,[1]**

       **Plaintiff,**

                               **Case No. 3:21-cv-8815**

   **v.**                         **Magistrate Judge Norah McCann King**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

       **Defendant.**

### OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Cathy T. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

### I.    PROCEDURAL HISTORY

On August 13, 2014, Plaintiff filed her application for benefits, alleging that she has been disabled since April 19, 2014. R. 101, 113, 205–11. The application was denied initially and on

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.
[2] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

reconsideration. R. 128–32, 137–39. Plaintiff sought a *de novo* hearing before an administrative law judge. R. 140–41. Administrative Law Judge Peter Lee ("ALJ") held a hearing on February 13, 2018, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. 55–100. In a decision dated May 22, 2018, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from April 19, 2014, Plaintiff's alleged disability onset date, through March 31, 2017, the date on which Plaintiff was last insured for DIB ("2018 decision"). R. 27–37. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on July 15, 2019. R. 1–7. Plaintiff timely filed an appeal from that decision pursuant to 42 U.S.C. § 405(g). R. 2676−83. On May 18, 2020, United States District Judge Brian R. Martinotti, acting on the parties' agreed order, reversed the 2018 decision and remanded the action for further proceedings. R. 2684–86; *T*[.] *v. Comm'r of Soc. Sec.*, 3:19-cv-18093 (D.N.J. May 18, 2020).

On remand, the Appeals Council vacated the 2018 decision and remanded the action to the ALJ for resolution of the following issues:

- The hearing decision did not include an adequate evaluation of the opinion evidence. In February of 2015, a treating physician, Hoan T. Nguyen, M.D., submitted a narrative letter regarding the claimant's impairment history (Exhibit 36F, pages 541-550). In this letter, Dr. Nguyen noted that the claimant could not work starting in June of 2014, that she needed to wear a back brace, that she required narcotic pain medication, that she fatigued easily and that she had limited range of motion in her back (Id., at pages 543- 550). Additionally, in September of 2015, the claimant's treating surgeon, Samuel K. Cho, M.D., completed a medical assessment that found the claimant incapable of even sedentary work activity due to her lumbar spine impairment (Exhibit 46F, pages 1-3). *The decision did not consider the medical opinion of Dr. Nguyen (Decision, pages 5-9). Additionally, the decision gave limited weight to Dr. Cho's medical opinion without fully considering the factors for weighing medical opinions noted in 20 CFR 404.1527 (Decision, page 9).*[3] *Further, the*

---

[3] "The decision states, 'Although I find the claimant suffers from limitations, I do not find the evidence supports such debilitating limitations as Dr. Cho opines. As such, I afford this opinion limited weight' (Decision, page 9)."

*decision's reliance on the opinions of the State agency medical consultants is misplaced (Decision, page 9), as those doctors did not review the entire record (Exhibits 2A, 4A).* As such, further evaluation of the medical opinions is warranted.

- Further consideration of the claimant's residual functional capacity is necessary. The decision determined that the claimant could perform a limited range of light work (Decision, page 5). This decision does not appear to be supported by substantial evidence. First, the decision did not fully consider the medical evidence. The medical record in this case consists of over 2,000 pages of evidence (Exhibits 1F-74F). The decision reviewed this evidence in two pages and then determined that the claimant could perform light work (Decision, pages 7-9). This brief overview of the evidence does not provide an adequate basis for the residual functional capacity. Additionally, the decision determined that the claimant's irritable bowel syndrome constituted a severe impairment (Decision, page 3). It is unclear; however, which limitations in the residual functional capacity reflect this impairment (Decision, pages 5-9). *Additionally, the decision determined that the claimant "must also be able to wear protective gloves while performing job duties" due to the claimant's allergy to plastic (Id., at 5). It is unclear, however, whether this limitation would remedy the claimant's problem.* Finally, the decision gave substantial weight to the opinions from the State agency medical consultants (Decision, page 9), but the residual functional capacity did not reflect all of the limitations noted in those opinions, without explanation (Decision, page 5; Exhibits 2A, page 9; 4A, page 9).[4] Therefore, remand is necessary to reconsider the claimant's residual functional capacity.

R. 2691–92 (emphasis added) ("Appeals Council Remand Order"). The Appeals Council further

directed the ALJ to do the following upon remand:

Confirm that the claimant's date last insured for disability benefits is March 31, 2017.

- If necessary, obtain updated evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding existing medical evidence (20 CFR 404.1512). If necessary, the Administrative Law Judge may obtain additional evidence regarding the claimant's allergy to plastic.

- Further consider the opinion evidence, particularly the opinions noted above (Exhibits 36F, pages 541-550; 46F, pages 1-3; 2A, 4A), pursuant to 20 CFR 404.1527, and articulate those findings in the hearing decision.

---

[4] "The State agency medical consultants noted that the claimant would be 'limited for high production norm tasks/settings' (Exhibits 2A, page 9; 4A, page 9). The decision includes no pace or production limitations (Decision, page 5)."

- Reevaluate the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to the evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Rulings 85-15 and 96-8p). In doing so, the decision should adequately review the medical evidence.

- If necessary by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-12, 83-14, 85-15 and 96-9p). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

R. 2692–93 (instructing further that the ALJ must "take any further action needed to complete the administrative record and issue a new decision").

On remand, the ALJ held a hearing on November 4, 2020, at which Plaintiff, who was again represented by counsel, testified, as did a vocational expert. R. 2602–45. In a decision dated December 14, 2020, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from April 19, 2014, Plaintiff's alleged disability onset date, through March 31, 2017, the date on which Plaintiff was last insured (the "2020 decision"). R. 2545–71.

Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On June 14, 2022, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No.

19.[5] On that same day, the case was reassigned to the undersigned. ECF No. 20. The matter is

ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations. And whatever the meaning of substantial in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is more than a mere scintilla. It means – and means only – such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks

omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal

quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009)

(citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018

WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot

be set aside merely because the Court "acting de novo might have reached a different

---

[5] The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

### B.   Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.   2018 DECISION

At step one in the 2018 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity between April 19, 2014, her alleged disability onset date, and March 31, 2017, the date on which she was last insured. R. 29.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease; radiculopathy; gastroesophageal reflux disease ("GERD"); irritable bowel syndrome ("IBS"); shoulder impingement; hypertension; hyperlipidemia; an affective

disorder; and anxiety. R. 29. The ALJ also found that Plaintiff's diagnosed diverticulitis and pituitary enlargement and her alleged fibromyalgia were not severe impairments. R. 30.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 30–31.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 31–35. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a fast food service manager and deli counter worker. R. 35.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs—*e.g.,* jobs as a cleaner, a chaperone, and a parking lot attendant—existed in the national economy and could be performed by Plaintiff. R. 35–36. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from April 19, 2014, her alleged disability onset date, through March 31, 2017, her date last insured. R. 36.

## IV.    2020 DECISION AND APPELLATE ISSUES

Plaintiff was 52 years old on the date on which she was last insured for DIB. R. 2539. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between April 19, 2014, her alleged disability onset date, and that date. R. 2548.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease ("DDD") with radiculopathy; GERD; IBS; shoulder impingement; hypertension; hypotension; depressive disorder; and an anxiety disorder. R. 2549.  The ALJ also found that Plaintiff's diagnosed pituitary enlargement or adenoma, diverticulitis, and hyperlipidemia, and her alleged migraine headaches and allergy to plastic, were not severe; the

ALJ also found that Plaintiff's alleged fibromyalgia was not a medically determinable impairment. R. 2549–52.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 2552–57.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 2557–69. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as telephone sales manager and deli clerk. R. 2569.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs–*e.g.*, jobs as a price marker, a sub-assembler, and a collator operator– existed in the national economy and could be performed by Plaintiff. R. 2570–71. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from April 19, 2014, her alleged disability onset date, through March 31, 2017, the date on which she was last insured. R. 2571.

Plaintiff disagrees with the ALJ's findings at steps three and four and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Initial Brief,* ECF No. 11; *Plaintiff's Reply Brief*, ECF No. 18. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 15.

## V.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Christopher Williamson, Psy.D.

On October 23, 2014, Christopher Williamson, Psy.D., a psychological consultative

examiner, consultatively examined Plaintiff. R. 1139–1141. Dr. Williamson summarized

Plaintiff's reported history as follows:

> Cathy presents for evaluation as a 49-year-old female. She is currently receiving
> temporary disability. She simply states "I just want to feel better" but feels as if her
> current difficulties are "never ending." She had been working in the food industry.
> She had her own ice cream parlor in the past. She last worked in an Italian deli.
> Psychiatrically, she had treated many years ago after her mother passed away. She
> had difficulty adjusting to the loss and was easily overwhelmed. However, now she
> struggles with ongoing issues of depression. *She states it is a day-to-day struggle.*
> *She states "there are moments when I lose it," becoming increasingly*
> *overwhelmed. She reports "severe panic attacks" which started when her mother*
> *passed away in 1999. She reports frequent heart palpitations, difficulty breathing,*
> *and chest tightness. She has gone to the emergency room on several occasions*
> *fearing she was having a heart attack.* She is currently prescribed amitriptyline,
> lorazepam, Norco, cortisone, and Entocort.
>
> Cathy was subsequently diagnosed with fibromyalgia and chronic pain in
> conjunction with a history of kidney stones which she states is simply "a domino
> effect." She reports that she was involved in a motor vehicle accident in 2007 and
> was out of work for several years. She states, however, she has historically always
> been gainfully employed and busy. When she was out of work, she began to
> experience panic attacks. As a result of the motor vehicle accident, she had a neck
> fusion in June 2007 and back surgery thereafter due to a herniated disc and more
> recently in September 2014, she had another back surgery for fusion. She has had
> a bone stimulator for the last two weeks. However, she states that she developed
> hives as a result. *She began to experience "full blown panic attacks" and became*
> *"overwhelmed with life."* Medically, she additionally had a heart catheterization 10
> years ago. She reportedly struggles with low blood pressure.

R. 1139 (emphasis added). Dr. Williamson noted the following background information:

> Cathy currently lives with her husband. She is previously married and divorced and
> subsequently remarried. She has no children. She has two brothers and two sisters
> with whom she maintains a positive relationship. Her mother is since deceased. She
> states "I miss my mother. I have no one to help me". She reports that she has
> difficulty coping with multiple losses. *She is increasingly anxious with regard to*
> *the uncertainty of her future.* Her father remains alive. There is a family history of
> psychiatric illness. Academically, she is a high school graduate. She has an active

12

driver's license. She has a few friends. She has struggled with significant losses in the past. *She has ongoing trust issues. She has a hard time doing day-to-day chores. She reports ongoing financial concerns. She has a hard time sustaining day-to-day activities. She reports that her last relationship was negative, stating that the individual she was with "took over $200,000" during a 17-year relationship. She reports multiple external stressors.*

R. 1140 (emphasis added). Upon mental status evaluation, Dr. Williamson observed as follows:

Cathy presents for evaluation as a 49-year-old female. She arrived on time as scheduled. She was casually dressed and groomed, appearing her stated age. She was pleasant and cooperative throughout. She is rather matter of fact with her presentation although cooperative throughout. There was no evidence of a formal thought disorder. There were no noted compulsions of thinking and/or behavior. Verbalizations were clear, coherent, and goal-directed. *Her overall mood appeared noticeably depressed. She was tearful throughout. She was noticeably anxious.* She denies any issues of suicidal ideation and/or substance use or abuse. She could repeat up to 6 digits forwards and 5 digits backwards. *She was unable to accurately complete Serial 7's, subtracting 7 from 100 in reverse order.* She could complete simple mathematical calculations of addition and subtraction. Her overall fund of knowledge appeared to be in the average range. Abstract reasoning appeared intact. She was well oriented to time, place and person, as well as recent current events. She could recall 3 out of 3 common objects at 5- and 10-minute intervals. *She was noticeably fragile and overwhelmed.*

*Id.* (emphasis added). As to diagnostic considerations, Dr. Williamson noted as follows:

Cathy presents for evaluation as a 49-year-old female with multiple medical concerns including chronic pain, fibromyalgia, and head injury sustained in a motor vehicle accident in 2007 resulting in multiple surgeries and recent back surgery for fusion. She has had a heart catheterization many years ago. *She is increasingly overwhelmed by her medical condition and ongoing psychiatric concerns. She states that she struggles with the uncertainty of the future and feels she is getting knocked out as simply a domino effect.*

*Id.* (emphasis added). Dr. Williamson diagnosed an adjustment disorder with depression and panic disorder opined that "[h]er overall prognosis remains guarded due to the chronicity of her current symptom presentation." *Id.*

**B.    Hoan Nguyen, M.D.**

On February 23, 2015, Hoan Nguyen, M.D., Plaintiff's treating neurosurgeon, issued an

13

updated his July 10, 2013, report, R. 2005–14, and summarized Plaintiff's treatment history.[6] R. 2005–13. Dr. Nguyen noted, *inter alia*, that Plaintiff "had a previous L4-5 and L5-S1 discectomy in September 2011" and that, in September 2013, he had observed "granulation tissue and scar tissue at the L4-5 and L5-Sl levels. I recommended that she use a back brace and gave her a BOA back brace." R. 2006. In November 2013, Plaintiff complained of worsening back pain with radiating pain to the right leg down to the right foot and she had complained that "it was to the point that it was affecting her ability to work." *Id.* Dr. Nguyen recommended an epidural injection. *Id.* During a follow-up visit in January 2014, Plaintiff continued to complain of diffuse low back pain. *Id.* She had "held off on the epidural due to side effects from epidurals done in the past." *Id.* Plaintiff was to take Norco as needed for pain. *Id.*

In March, April, and June 2014, Plaintiff complained to Dr. Nguyen of chronic low back pain with radiating pain to the right leg with numbness and tingling in the right foot with pain at 10/10. R. 2007. While authorization for surgery was pending in July and August 2014, Plaintiff continued to complain of localized pain in the lower lumbar area with radicular symptoms. R. 2007–08. Plaintiff was to continue taking Norco as needed for pain. R. 2007.

On September 17, 2014, Dr. Nguyen performed a laminectomy and fusion with application of polyetheretherketone ("PEEK") interbody cages at L4-L5 and L5-S1. R. 2008. In a follow-up visit on October 6, 2014, Plaintiff continued to complain of soreness in her back, but "[o]verall, she continued to do relatively well following the surgery." R. 2009.

At an initial physical therapy evaluation on October 15, 2014, Plaintiff "complained of lower back pain and reported difficulty with prolonged standing and walking, and driving for

---

[6] This report predates Plaintiff's alleged disability onset date of April 19, 2014, and Plaintiff does not base her arguments on this 2013 report.

longer than ten minutes. She was unable to lift heavy objects and had difficulty doing household chores." *Id*. Plaintiff underwent physical therapy from October 15, 2014, through October 20, 2014. *Id*.

On October 27, 2014, Dr. Nguyen saw Plaintiff for a follow-up visit and commented that she "was doing well in regard to her back. . . . Her main complaint that day was a breakout of hives throughout her body. . . . She went to the Emergency Department and was given some steroids. The steroids did help with the hives. When she stopped the steroids, the hives returned. The hives did not begin until about a week and a half before when she started using the bone stimulator." R. 2010. Dr. Nguyen noted that "[t]he only area of hives was in her abdomen." *Id*.

"A month after the surgery, she had had persistent hives throughout her torso, arms, and legs. She had been seeing her allergist who had placed her on steroids which helped the hives, but she still had persistent hives with itching and swelling." *Id*. According to Dr. Nguyen, "[i]t appeared she was having an allergic reaction to the cobalt chrome in the screws. At that time, I recommended removal of the cobalt chrome screws and changing them to titanium screws. We planned to proceed with the surgery following medical clearance and authorization." *Id*. On November 17, 2014, Plaintiff "was having hives throughout her body. She was currently on allergy medications including steroids. Despite the steroids, she continued to break out in hives." *Id*. On November 19, 2014, Dr. Nguyen surgically replaced the screws. R. 2011. There were no complications and Plaintiff tolerated the procedure well. *Id*.

On November 24, 2014, Dr. Nguyen noted that "Prednisone was controlling her hives but was giving her stomach irritation." *Id*. Upon examination, Dr. Nguyen noted that Plaintiff "was neurovascularly intact throughout. Motor strength was 5/5 in all muscle groups. Sensation was grossly intact." *Id*. He further noted that, "[a]t that time, it was unclear if the instrumentation was

causing an allergy since she had the instrumentation replaced." *Id.*

A follow-up visit on December 1, 2014, revealed that Plaintiff's hives had returned, "but they were slowly improving. She had been walking without any problems. She did have continued soreness and discomfort in her back." *Id.* On January 12, 2015, Plaintiff reported to Dr. Nguyen that she "had seen her allergist who gave her injections. Since the injections, she had had no further hives. She was no longer taking steroids; but was taking antihistamines. She had some soreness in her back. She also had cramping in her calves but the radiating pain to the legs that she had prior to surgery had improved." R. 2012. On the same day, x-rays of the lumbar spine revealed that "the implants were in place. There were no signs of loosening or failure. She had good overall alignment. She was healing well." *Id.* Dr. Nguyen stated that he "wanted to continue to monitor her allergic reaction to the implants." *Id.*

At a follow-up visit on February 16, 2015, Dr. Nguyen noted that Plaintiff had experienced no more hives, was no longer taking steroids, and "was doing well regarding her allergic reaction." R. 2013. Plaintiff "continued to have soreness in her back. She also had intermittent radiating pain to the legs, particularly at the end of the day. She was slowly progressing with the physical therapy." *Id.* X-rays of the lumbar spine "showed the implants were in good position with no signs of loosening or failure. She had good overall alignment." *Id.* Plaintiff was scheduled to return to Dr. Nguyen for a follow-up visit on March 9, 2015. *Id.*

Dr. Nguyen diagnosed recurrent herniated nucleus pulposus, L4-L5; herniated nucleus pulposus, L5-S1; lumbar radiculopathy; cervical disc bulge; and cervical radiculopathy. *Id.* Dr. Nguyen went on to opine as follows:

> It is further my opinion that the injuries [Plaintiff] sustained as a result of the motor vehicle accident of 3/21/11 are permanent in nature. She required multiple surgeries in the lumbar spine. She had a revision discectomy at L4-5 and L5-S1 in September 2011. She continued to be symptomatic and required decompression and fusion

16

with instrumentation of the lumbar spine at L4-5 and L5-S1 on 9/17/14. *She had an adverse reaction to the implants* and had a revision of the instrumentation on 11/19/14. [Plaintiff] has since *improved following the surgery. Her low back pain and radicular symptoms in the lower extremities have improved following the multiple surgeries but she remains symptomatic.*

[Plaintiff] continues to be affected in her activities of daily living. She continues the use of chronic pain medications, including narcotic pain medications. *She continues to require the use of a back brace for lumbar support. [Plaintiff] is still limited in her overall range of motion and her endurance as she fatigues easily.*

[Plaintiff] will continue to require treatment due to the injuries she sustained in her cervical and lumbar spine as a result of the accident of 3/21/11. This includes, but is not limited to, further pain management, pain medications, physical therapy, epidural injections, and further surgical intervention. She may require extension of her fusion in the cervical spine and removal of the instrumentation in the lumbar spine if she has return of the allergic reaction to the instrumentation in the lumbar spine. [Plaintiff] may also require extension of the fusion in the lumbar spine.

R. 2014 (emphasis added).

### C.   Samuel Cho, M.D.

On September 4, 2015, Samuel Cho, M.D., Plaintiff's treating neurosurgeon, performed an exploration of the spinal fusion and removal of PEEK cage revision, anterior lumbar interbody fusion at L4-L5 and LS-S1, anterior instrumentation at L4-L5 and LS-S1 with use of structural allograft, in light of Plaintiff's "low back pain and *severe allergic reaction to PEEK cage*. As a result, the patient was on chronic steroids. Radiographic studies also revealed a potential nonunion at L4-LS and L5-S1 where she had undergone previous spinal fusion. Therefore, surgical exploration and revision fusion with removal of PEEK cages were recommended and the patient opted to undergo the proposed surgery." R. 2077–78 (reflecting operative report) (emphasis added). According to Dr. Cho, there were no complications and Plaintiff's condition was stable. R. 2077.

On September 21, 2015, Dr. Cho completed a two-page, check the box, and fill-in-the-blank form entitled, "General Medical Report." R. 2074–76. Dr. Cho indicated that he had first

examined Plaintiff on August 13, 2015, which was also the date of his most recent examination. R. 2074. Under physical findings, Dr. Cho identified a "severe allergic response to PEEK cage [with] lumbosacral pain. Pseudoarthrosis." *Id.* Asked to identify laboratory and special studies, Dr. Cho identified the following:

Procedure performed

- Exploration of spinal fusion
- Removal of PEEK cage, revision anterior lumbar interbody fusion at L4-L5, L5-S1, anterior instrumentation L4-L5, S1, and the use of structural allograft.

Uncomplicated, condition stable.

*Id*. Asked to summarize Plaintiff's treatment and response, Dr. Cho referred to "operative report /pathology." R. 2075. Dr. Cho offered no opinion as to Plaintiff's ability to lift and carry, but opined that she could stand/walk less than two hours a day and could sit for less than six hours a day. *Id*. According to Dr. Cho, Plaintiff's ability to push and/or pull, handle objects, hear, speak, and travel were "[l]imited[.]" *Id*. Dr. Cho also indicated that Plaintiff's "weakness and numbness of lumbosacral region and bilateral lower extremity" would limit her ability to perform work related activities *Id*.

## VI.    DISCUSSION

### A.    Step Three and Opinion Evidence

Plaintiff challenges the ALJ's finding at step three of the sequential evaluation that Plaintiff's mental impairments neither meet nor medically equal a listed impairment, specifically, Listings 12.04 or 12.06. *Plaintiff's Brief*, ECF No. 11, pp. 9–18; *Plaintiff's Reply Brief*, ECF No. 18, pp. 3–9. Plaintiff's challenge is not well taken.

At step three, an ALJ considers whether the combination of the claimant's medically determinable impairments meets or equals the severity of any of the impairments in the Listing

of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). An impairment meets a listed impairment if it satisfies "'*all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Jones,* 364 F.3d at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (emphasis in original). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the *overall* functional impact of h[er] unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis added). "[T]he medical criteria defining the listed impairments [are set] at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of h[er] age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id.* at 532 (emphasis in original) (quoting 20 C.F.R. § 416.925(a)). Although an ALJ is not required to use "particular language" when determining whether a claimant meets a listing, the ALJ's discussion must provide for "meaningful review." *Jones*, 364 F.3d at 505 (citing *Burnett*, 220 F.3d at 120). Accordingly, if the ALJ's decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing," "[t]his discussion satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review of the step three determination." *Id.*

Listing 12.04 addresses depressive, bipolar, and related disorders, and Listing 12.06 addresses anxiety and obsessive-compulsive disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04 and 12.06 (eff. Mar. 14, 2018 to Apr. 1, 2021). In order to meet either of these Listings, a claimant must meet the Listings' paragraph A criteria and either the paragraph B or paragraph C

criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.[7] The paragraph B criteria are met

when a claimant has an extreme limitation of one, or a marked limitation of two,[8] of the

following four mental functional areas: understand, remember or apply information; interact with

others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* at §§ 12.04B,

12.06B.

At step two of the 2020 decision, the ALJ determined that Plaintiff suffered the severe

impairments of, *inter alia*, a depressive disorder and an anxiety disorder. R. 2549. The ALJ

determined at step three that Plaintiff's impairments, whether considered singly or in

combination, neither met nor medically equalled any listing. R. 2552–57. In determining whether

Plaintiff's mental impairments met or medically equaled Listings 12.04 or 12.06, the ALJ

specifically explained why he found that Plaintiff had only mild or moderate limitations in the

four broad areas of functioning under the paragraph B criteria—with citation to the record,

including opinion evidence—and why Plaintiff did not meet the criteria of Paragraph C of those

---

[7] The ALJ did not expressly discuss the paragraph A criteria of the Listings, R. 2554–57, and
Plaintiff does not challenge this omission. *See generally Plaintiff's Brief*, ECF No. 11; *Plaintiff's
Reply Brief*, ECF No. 18. Remand is not required on this basis because the ALJ determined that
Plaintiff's mental impairments did not in any event satisfy the paragraphs B or C criteria of the
Listing. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (stating that
"the omission of the 'paragraph A' analysis does not render the ALJ's decision unreviewable"
where "[i]t is quite plain that the ALJ's decision rested on the absence of both 'paragraph B" and
'paragraph C' criteria[.]"); *Lewis v. Comm'r of Soc. Sec.*, No. 15CV06275, 2017 WL 6329703, at
*8 (D.N.J. Dec. 11, 2017) ("In reviewing a case, 20 C.F.R. Part.404, Subpart P indicates that a
claimant must prove both Paragraph A and B criteria. The ALJ simply chose to proceed with a
full analysis of Paragraph B, and, upon determining that Paragraph B was not satisfied, chose not
to address Paragraph A as there would be no point given that the criteria for Paragraph B had
already failed.").

[8] A "marked" limitation means that the claimant is seriously limited the ability to function
independently, appropriately, and effectively and on a sustained basis in a specified area. §
12.00A2b, 12.00F2d. An "extreme" limitation means that the claimant is unable to function
independently, appropriately, and effectively on a sustained basis in a specified area. *Id.* at
§12.00F2e.

Listings,[9] reasoning as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

> In understanding, remembering or applying information, the claimant had a moderate limitation. At the November 4, 2020 hearing, the claimant testified that she had panic attacks "all the time," including heart palpitations every day, cold sweats randomly including while driving, and "constant panic." She noted that she had "brain fog," where she would forget the topic in the middle of a conversation or forget why she went into a room. However, during the period at issue, the only mental health treatment with a specialist occurred at an August 17, 2015 consultation with Cristina Shaheen, Pys.D., which involved providing background information and her report of current symptoms only (44F). Therefore, there is no documented mental status examination contained within that report (Id.). In the August 21, 2014 Adult Function report, the claimant reported that she was able to pay attention for "about ten minutes," and she had to write down spoken instructions (3E/6). However, at the same time, she reported that she could follow written instructions "well," and she required no reminders go to places and take care of her personal needs, grooming or medication (3E/5-6). Further, she noted no changes in the ability to handle money, and she was able to get around every day by driving a car alone and independently (3E/3-4). In the March 20, 2015 Adult Function report, the claimant continued to report the ability to pay attention for only ten minutes (9E/6). However, at that time, she was able to follow written and spoken instructions "very well," handled money without changes, get around by driving independently, and required no special reminders for her personal needs, grooming, or medications (9E/3-5). *At the October 23, 2014 psychological consultative examination* [conducted by Christopher Williamson, Psy.D.]*, the mental status examination revealed an inability to perform serial seven subtraction accurately, but she was able to perform simple mathematical calculations (24F)* [R. 1139–41]. *Moreover, she exhibited intact abstract reasoning, intact orientation, and coherent and goal-directed thought process (Id.)*. On May 8, 2014, cardiologist Dr. Sandler found "normal cognitive functioning" on examination (17F/97-101). On March 31, 2015, cardiac electrophysiologist Ihab Girgis, M.D., also documented "normal cognitive functioning" (38F/2-6; 39F/1-5). On January 14, 2016 and September 26, 2016, neurologist Dr. Fitzpatrick documented "normal mental status" (70F/3-5). At visits from July 17, 2015 through April 21, 2017, pain

---

[9] Plaintiff does not challenge the ALJ's consideration of the paragraph C criteria.

management provider Dr. Meyers noted that the claimant consistently denied panic attacks, suicidal ideation and depression in the Review of Systems ("ROS") (43F/1-5; 54F/16-17, 21-23, 26-29, 34-39, 40-88). Accordingly, the overall evidence of record substantiates a moderate, but not marked, limitation in understanding, remembering or applying information.

In interacting with others, the claimant had a mild limitation. At the February 13, 2018 hearing, the claimant testified that her anxiety caused her to "have not gone out in public," but she noted that she did go to her brother's house to watch his sixteen-month old and six-year-old children. Further, in terms of getting along with others, she stated, "I get along great," and she had "no issues with getting along with others." In the August 21, 2014 Adult Function report, she reported that she had no problems getting along with family, friends, neighbors and others, and she got along with authority figures "very well" (3E/5, 7). Moreover, at that time, she reported that she left her house every day alone by driving or walking, shopped in stores once every couple of weeks, and engaged in social activities by phone or computer every day (3E/3-5). In the March 20, 2015 Adult Function report, she continued to report no problems in getting along with others, but she noted that she did not go out except for doctor's appointments (9E/6). At the same time, she reported the continued ability to go out alone by driving and shopped in stores (9F/5-6). *At the October 23, 2014 psychological consultative examination* [conducted by Christopher Williamson, Psy.D.], *the claimant exhibited a pleasant and cooperative attitude, with noticeable anxiety and tearfulness (24F)* [R. 1139–41]. Other than the August 17, 2015 consultation with Dr. Shaheen, there is no other treatment with a mental health specialist (44F). Accordingly, the overall evidence of record substantiates a mild, but not moderate, limitation in interacting with others.

With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation. As noted above, the claimant testified to panic attacks "all the time" and "brain fog" that resulted in loss of concentration during conversations or in retrieving items from a room. Furthermore, she testified to crying spells. However, the only documented evaluation during the period at issue is the August 17, 2015 consultation with Dr. Shaheen where the claimant subjectively provided background information and her current symptoms without documentation of a full formal mental status examination (44F). In the August 21, 2014 Adult Function report, the claimant reported that she was able to complete tasks but it took her longer (3E/6). However, at the same time, she reported that she could follow written instructions "well," and she required no reminders go to places and take care of her personal needs, grooming or medication, continued to drive independently, and handled money without changes (3E/3-6). In the March 20, 2015 Adult Function report, she reported the same activities and limitations, including taking longer to complete tasks (9E/3-7). *At the October 23, 2014 psychological consultative examination* [conducted by Christopher Williamson, Psy.D.], *the mental status examination revealed an inability to perform serial seven subtraction accurately, but she was able to perform simple mathematical calculations (24F)* [R. 1139–41].

*Moreover, she exhibited intact abstract reasoning, intact orientation, and coherent and goal-directed thought process (Id.)*. On May 8, 2014, cardiologist Dr. Sandler found "normal cognitive functioning" on examination (17F/97-101). On March 31, 2015, cardiac electrophysiologist Ihab Girgis, M.D., also documented "normal cognitive functioning" (38F/2-6; 39F/1-5). On January 14, 2016 and September 26, 2016, neurologist Dr. Fitzpatrick documented "normal mental status" (70F/3-5). Notably, in terms of her driving, she informed neurologist Dr. Fitzpatrick on December 8, 2016 that she had been doing "a lot of driving in August when her father was ill in the hospital" (70F/1-2). At visits from July 17, 2015 through April 21, 2017, pain management provider Dr. Meyers noted that the claimant consistently denied panic attacks, suicidal ideation and depression in the Review of Systems ("ROS") (43F/1-5; 54F/16-17, 21-23, 26-29, 34-39, 40-88). Accordingly, the overall evidence of record substantiates a moderate, but not marked, limitation in concentrating, persisting or maintaining pace.

As for adapting or managing oneself, the claimant had experienced a mild limitation. In the August 21, 2014 Adult Function report, the claimant reported that she handled changes in routine and stress "well," but she noted that she does "get panic attacks" (3E/7). Further, she noted that she required assistance with dressing, but this was attributable to her back pain (3E/2). Otherwise, she was independent in her personal care needs, traveling independently, shopping in stores, and handling money (3E/3-7). In the March 20, 2015 Adult Function report, she reported that dressing and bathing took longer and she had to sit to shave but she continued to attribute these limitations to her lumbar spine condition (9E). At that time, she was still traveling independently by driving, shopping in stores, handling money without changes despite reporting more frequent panic attacks (9E/2-7). *At the October 23, 2014 psychological consultative examination* [conducted by Christopher Williamson, Psy.D.], *the claimant exhibited casual dressing and grooming, no evidence of a formal thought disorder, and average range general fund of information (24F)* [R. 1139–41]. The record contains no longitudinal treatment with a mental health specialist during the period at issue. Despite the lack of such treatment, there is no documentation of emergency department visits or inpatient psychiatric hospitalizations for an increase in her symptoms. Accordingly, the overall evidence of record substantiates a mild, but not moderate, limitation in adapting or managing oneself.

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

R. 2554–56 (emphasis added). The ALJ went on to further explain as follows:

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process

23

requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

On November 13, 2014 and August 25, 2015, State agency psychological consultants Ellen Atkins, Ph.D., and Joan Joynson, Ph.D., opined that the claimant had mild limitations in activities of daily living and social functioning, moderate limitations in concentration, persistence or pace, and no episodes of decompensation (2A/6; 4A/10-11). I accord partial weight to these opinions. First, I note that the "paragraph B" criteria have been revised, and these revisions eliminate the domains of activities of daily living and episodes of decompensation. Therefore, I accord no weight to those portions of the opinion because these domains are no longer applicable. However, the revisions to the "paragraph B" criteria changed only the name but not the essence by switching to interacting with others and concentrating, persisting or maintaining pace in place of social functioning and concentration, persistence or pace. With those portions of the opinions, I accord significant weight because these opinions are consistent with the overall evidence of record including subsequently produced evidence. As noted above, the claimant has alleged going out less but she has denied problems getting along with others including authority figures in the August 21, 2014 and March 20, 2015 Adult Function reports. As for concentrating, persisting or maintaining pace, the claimant continued to drive independently, shop in stores, manage money independently, and perform her personal care needs and manage medications without any significant difficulties. Moreover, other than prescribed medications from other providers, the only treatment with a mental health specialist during the period at issue is a single consultation, which did not include documentation of a formal mental status examination. The psychological consultative examination at the psychological consultative examination revealed relatively minimal findings, and the records from her pain management provider during the latter portion of the period at issue contains indications of consistent denials of depression, suicidal ideation or panic attacks.

R. 2556–57. This thorough discussion of the evidence provides substantial support for the ALJ's reasoning in this regard. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06; *see also Lama Z. v. Comm'r of Soc. Sec.*, No. 2:22-CV-00763, 2022 WL 16552821, at *10 (D.N.J. Oct. 28, 2022) (finding substantial evidence supported the ALJ's finding that the claimant did not meet the paragraph B criteria of Listing 12.04—concluding the claimant had moderate limitations in the ability to understand, remember, or apply information and concentrate, persist, or maintain pace, and mild limitations in the ability to interact with others and adapt of manage oneself—

where the ALJ relied, in part, on the claimant's function report, which noted that the claimant "had no difficulty talking, hearing, remembering, concentrating, understanding, following instructions, getting along with others, performing personal care, driving, shopping, and managing money"; the claimant's "examinations and her physician's clinical findings revealed Plaintiff was calm, pleasant, cooperative, and responsive; she denied suicidal or homicidal thoughts; she was alert, oriented, and of average intelligence; and her insight, judgment, and fund of information was appropriate"; and the claimant's "performance on mental evaluations and assessments revealed, generally, [she] suffers from mental limitations, but also, that she is capable of performing simple and routine tasks").

Plaintiff, however, challenges the ALJ's consideration of the paragraph B criteria, arguing that the Appeals Council Remand Order "mandated the ALJ apply all of the unapplied undisputed probative and relevant doctor's findings to the 'B' criteria." *Plaintiff's Brief*, ECF No. 11, p. 13; *see also Plaintiff's Reply Brief*, ECF No. 18, pp. 4–5. In advancing this argument, Plaintiff cites to the following evidence:  "documented history of anxiety and depression"; "documented severe anxiety post second surgery was not getting any better"; "diagnosed Syncope caused heart palpations due to an overwhelming feeling and panic attacks"; "documented anxiety, low motivation, crying, racing thoughts, distractibility and poor memory"; "severe fatigue caused by anxiety and depression due to plaintiff's severe allergy to plastic and the peek cages"; and "documented depression that led to suicidal thoughts." *Plaintiff's Brief*, ECF No. 11, pp. 13–14 (citing R. 851, 1395, 2036, 2046, 2071, 2118, 2378–80); *see also Plaintiff's Reply Brief*, ECF No. 18, pp. 4–5 (same). However, Plaintiff simply points to this evidence and does not explain how these diagnoses and conditions establish that Plaintiff has a marked or extreme limitation in any of the four broad areas of functioning under the paragraph B

25

criteria. *See id.*; *see also Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at

*2 (D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the

Court does not understand what argument Plaintiff has made here. Plaintiff has done no more

than thrown down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them

together. The Court does not assemble arguments for a party from fragments."). Moreover, as

detailed above, the ALJ relied on substantial evidence in Plaintiff's function reports regarding

her abilities and activities as well as on objective findings from her treating providers and from

the consultative examiner, Dr. Williamson, when finding that Plaintiff had only mild or moderate

limitations in the four broad areas of functioning outlined in paragraph B of the Listings. R.

2554–57. Notably, "[t]he presence of evidence in the record that supports a contrary conclusion

does not undermine the [ALJ's] decision so long as the record provides substantial support for

that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009) (citations

omitted); *see also Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) ("In

determining whether substantial evidence exists, this court cannot re-weigh the evidence or

substitute its judgment for that of the ALJ. . . . Thus, we will uphold the ALJ's decision even if

there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial

evidence' standard is satisfied.") (citations omitted); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d

356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence or impose their own

factual determinations [under the substantial evidence standard].").

    Plaintiff also argues that the ALJ ignored and failed to apply Dr. Williamson's "probative

and relevant examinations [sic] findings" in the "First Notice of Decision[.]" *Plaintiff's Brief*,

ECF No. 11, pp. 14–15; *Plaintiff's Reply Brief*, ECF No. 18, p. 7 (same). However, the 2018

decision, which was vacated by the Appeals Council, is not before this Court for review. R. 2691

("The Appeals Council hereby vacates the final decision of the Commissioner of Social Security [the 2018 decision]."); *see also Davis v. Comm'r Soc*. Sec., 849 F. App'x 354, 358 (3d Cir. 2021) (noting that "when the Appeals Council 'remands a case . . . after a court remand, it generally vacates the entire administrative law judge (ALJ) decision, and the ALJ must consider all pertinent issues de novo'") (quoting HALLEX I-2-8-18).

To the extent that Plaintiff argues that the ALJ failed to comply with the Appeals Council Remand Order because the ALJ made the same limitation findings in the four broad areas of functioning under paragraph B, *Plaintiff's Brief*, ECF No. 11, pp. 15–18; *Plaintiff's Reply Brief*, ECF No. 18, pp. 7–9, this Court disagrees. As a preliminary matter, any suggestion that the Appeals Council Remand Order mandated a certain finding or outcome in the later 2020 decision misses the mark. As detailed above, the Appeals Council vacated the 2018 decision and ordered the ALJ to, *inter alia*, further consider opinion evidence, particularly the opinions of Dr. Nguyen, Dr. Cho, and Dr. Williamson, and "take any further action needed to complete the administrative record and issue a new decision." R. 2691–93; *cf. LeBron v. Comm'r of Soc. Sec*., No. CV 18-14630, 2020 WL 7768401, at *9 (D.N.J. Dec. 30, 2020) (finding that the ALJ issuing a later decision "was not bound by" the earlier ALJ's decision, which the Appeals Council vacated and remanded to a new ALJ with directions to, *inter alia*, "'take any further action needed to complete the administrative record and issue a new decision'"). That is precisely what the ALJ did in the 2020 decision at step three: He specifically considered the opinion of, *inter alios*, Dr. Williamson and explained why that opinion, along with other record evidence, established that Plaintiff had no more than a mild or moderate limitation in each of the paragraph B criteria. R. 2554–57.

Plaintiff points to eighteen different "probative and relevant mental examinations [sic] findings" from Dr. Williamson's opinion that Plaintiff believes "are consistent with the treating doctors' objective findings and when applied increase B1 and B3 from moderate to marked and which directs a finding of disability per se." *Plaintiff's Brief*, ECF No. 11, pp. 15–18;[10] *Plaintiff's Reply Brief*, ECF No. 18, pp. 6–9 (same). Plaintiff has not persuaded this Court that this evidence requires remand. First, several of the "findings" highlighted by Plaintiff simply reflect Plaintiff's subjective complaints to Dr. Williamson. R. 1139–40. The mere memorialization of a claimant's subjective complaints in a medical record does not transform

---

[10] Plaintiff points to the following evidence from Dr Williamson's report:

1) She has ongoing trust issues.
2) Her last significant other stole $200,000 from her after a 17 year relationship.
3) She has a hard time doing day to day chores.
4) She has a hard time sustaining day to day activities.
5) She has many panic attacks which include frequent heart palpations, difficulty breathing and chest tightness.
6) It is a day to day struggle, there are moments when she losses it.
7) Her panic attacks have sent her to the hospital fearing a heart attack.
8) After her September 2014 back surgery she developed hives and started to develop full blown panic attacks and became overwhelmed with life. (This the on set [sic] date)[.]
9) Her overall mood appeared noticeably depressed.
10) She was tearful throughout.
11) She was noticeably anxious.
12) She was unable to accurately complete serial 7's subtracting 7 from 100 in reverse order.
13) She was noticeably fragile and overwhelmed.
14) She is increasing overwhelmed by her physical and psychiatric concerns.
15) She struggles with an uncertain future.
16) Diagnosis[] Adjustment disorder with depression, panic disorder.
17) Multiple medical concerns including low blood pressure, prior neck fusion, a herniated disc, resent back surgery in September 2014 and history of heart catheterization.
18) Her overall prognosis remains guarded due to the chronicity of her current symptom presentation.

*Id*. at 15–16.

those complaints into objective findings or a medical opinion. *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005) ("[A] medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report[.]") (summarizing *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir. 1996)); *Morris v. Barnhart*, 78 F. App'x 820, 824–25 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.") (citations omitted); *Famularo v. Comm'r of Soc. Sec.*, No. CV 20-1655, 2021 WL 613832, at *7 (D.N.J. Feb. 17, 2021) ("[A] a claimant's own subjective report about her symptoms[] does not become a medical opinion by virtue of being recorded in treatment notes.") (citations omitted). Moreover, as previously discussed, the ALJ considered Dr. Williamson's examination findings when the ALJ made his paragraph B determinations at step three. R. 2554–57. For example, the ALJ considered, *inter alia*, that Plaintiff had noticeable anxiety and tearfulness and noted that she could not perform serial seven subtraction. R. 2554–55. The ALJ also considered at step four that Dr. Williamson noted that Plaintiff reported "severe" panic attacks that began with her mother's death in 1999 and Plaintiff's struggles with depression and becoming increasingly overwhelmed; the ALJ also noted Dr. Williamson's observations of "tearfulness, noticeably depressed and anxious mood and affect, a notation that she was 'noticeably fragile and overwhelmed,' and an inability to complete serial sevens subtraction[,] but the ALJ also observed that Dr. Williamson "provided no opinion regarding the claimant's ability to perform work-related activities." R. 2565; *see also Jones*, 364 F.3d at 505 (stating that if the ALJ's decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing,"

29

"[t]his discussion satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review of the step three determination").

   To the extent that the ALJ did not expressly address at step three every one of the eighteen points that Plaintiff highlights, that error, if any, is harmless. As noted above, Plaintiff simply refers to this evidence and asserts that "when applied [will] increase B1 and B3 from moderate to marked" with no explanation as to why such evidence warrants a finding of marked limitations in the areas of understanding, remembering or applying information or concentrating, persisting or maintaining pace. *Plaintiff's Brief*, ECF No. 11, pp. 15–18; *Plaintiff's Reply Brief*, ECF No. 18, pp. 6–9 (same). Plaintiff bears the burden at step three and the Court will not construct Plaintiff's arguments for her. *See Padgett*, 2018 WL 1399307, at *2. In any event, as previously explained, so long as the substantial evidence standard is satisfied, the Court will not reweigh the evidence and will uphold the ALJ's decision even if there is contrary evidence that supports the opposite conclusion. *See Johnson*, 497 F. App'x at 201; *Malloy*, 306 F. App'x at 764; *Chandler*, 667 F.3d at 359.

   In short, this Court concludes that substantial evidence supports the ALJ's consideration of the evidence at step three, including Dr. Williamson's opinion, and the ALJ's finding that Plaintiff's mental impairments do not meet or medically equal any Listing, including Listings 12.04 or 12.06.

   **B.    RFC and Opinion Evidence**

   Plaintiff also argues that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to properly consider and account for her plastics allergy, failed to properly weigh the opinions of Drs. Nguyen and Cho, and "played doctor" when including a back brace in the RFC. Plaintiff's arguments are not well taken.

A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 404.1527(e), 404.1546(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ropes, ladders or scaffolds; never be exposed to unprotected heights or hazardous machinery; occasionally climb stairs and ramps; never crawl; occasionally stoop and crouch; occasional reaching overhead and frequent reaching in all other directions; frequently balance; work must be performed in an environment free of fast paced production requirements where productivity is measured at the end of the day and with only occasional changes to essential job functions; able to do only simple and routine tasks; able to wear a back brace during work hours; work must be done in a location with accessible restroom facilities.

R. 2557. In making this determination, the ALJ detailed years of record evidence in eleven single-spaced pages, including, *inter alia*, evidence that Plaintiff underwent a left shoulder arthroscopic surgery involving a distal clavicle resection, subacromial decompression, and debridement of the glenohumeral joint performed by Christopher Spagnuola, M.D., in May 2014, after which Plaintiff reported in January 2015 that she was able to perform activities of daily living; treatment records in September 2014 that revealed that Plaintiff had full motor strength in all muscle groups of the lower extremities, grossly intact sensation, unremarkable deep tendon reflexes, and no indication of gait abnormalities for the period March 2015 through June 2015; evidence from Plaintiff's pain management provider, Adam Meyers, D.O., which reflected consistent full motor strength in the lower extremities and relatively intact sensory functioning except for the first dorsal web space and dorsum of the feet with no findings of antalgic gait or use of an assistive device from the period July 17, 2015, through April 21, 2017; findings in August 2015 that, despite an antalgic gait and reduced range of motion of the cervical and lumbar spine, Plaintiff had full motor strength throughout the upper and lower extremities, including full motor strength in the wrist extensors, wrist flexors, finger abductors and finger grip, negative Romberg sign, intact sensation, and unremarkable deep tendon reflexes; the notation by Dr. Meyers in June and July 2016 that hydrocodone was "helpful in controlling her symptoms, enabling her to carry out a fairly normal level of functional activity" with no documentation of any reported side effects from hydrocodone and, other than an increased dosage on April 1, 2016, there were no changes in Plaintiff's medication from November 2016 to April 2017; the fact that the record contains no documentation of consistent treatment by a mental health specialist during the period at issue; Dr. Williamson's unremarkable mental status examination except for tearfulness, a noticeably depressed and anxious mood and affect, her

inability to complete serial sevens subtraction, and his notation that she was "noticeably fragile and overwhelmed," but, as the ALJ noted, he provided no opinion regarding Plaintiff's ability to perform work-related activities; her neurologist's normal mental status examination and the fact that her treating pain management provider has consistently documented her denials of panic attacks, depression or suicidal ideation; Plaintiff's report of relatively intact activities including the ability to drive, shop in stores, manage money, get along with others, and follow written instructions. R. 2557–68. As to any limitations flowing from her cervical and lumbar spine impairments, shoulder impingement, and mental impairments, the ALJ further explained as follows:

> Based on the foregoing, I have fully accounted for the cervical and lumbar spine impairments by limiting the claimant to light exertion, with occasional reaching overhead and frequent reaching in all other directions. Moreover, I have limited her to frequent balancing, occasional stooping, crouching, and climbing ramps and stairs, and no climbing ropes, ladders or scaffolds, with no exposure to unprotected heights or hazardous machinery. To alleviate any symptoms of the back pain, the residual functional capacity includes the ability to wear a back brace during work hours.

R. 2562.

> I have fully accounted for the bilateral shoulder impingement by limiting the claimant to light exertion which limits the amount of weight that she must lift, carry, push or pull during a typical eight-hour workday. Moreover, the residual functional capacity contains limitations to occasional overhead reaching and frequent reaching in all other directions.

R. 2563.

> I have fully accounted for the mental impairments by limiting the claimant to work in an environment free of fast-paced production requirements where productivity is measured at the end of the day, simple and routine tasks, and occasional changes to essential job functions.

R. 2566. In the view of this Court, this record contains substantial evidence to support the ALJ's

RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186

F.3d at 429.

Plaintiff, however, challenges the ALJ's RFC determination on a number of bases.

**A.      Plastics Allergy**

Pointing to evidence from Dr. Cho and Tina Zecca, D.O., Plaintiff's treating physician,

Plaintiff contends that the ALJ's 2020 decision improperly "reversed his previous finding that

the plaintiff suffered from a severe plastics allergy in finding the plaintiff's allergy to plastics

was not supported by a diagnosis[,]". *Plaintiff's Brief*, ECF No. 11, p. 20; *Plaintiff's Reply Brief*,

ECF No. 18, p. 11. Plaintiff further argues that the Appeals Council,[11] addressing the RFC in the

2018 decision that contained a requirement that Plaintiff wear plastic gloves,[12] ordered the ALJ

to explain how this limitation would accommodate Plaintiff's plastics allergy, which he did not

do. *Plaintiff's Brief*, ECF No. 11, pp. 19–21; *Plaintiff's Reply Brief*, ECF No. 18, pp. 10–13. The

Court is not persuaded that this issue requires remand. As an initial matter, to the extent that

---

[11] The Appeals Council vacated the 2018 decision and remanded for, *inter alia*, further
consideration of the RFC, including, among other things, the limitation that Plaintiff "'must wear
protective gloves while performing job duties; due to the claimant's allergy to plastic. . . . It is
unclear, however, whether this limitation would remedy the claimant's problem." R. 2692.
[12] In the 2018 decision, the ALJ found that Plaintiff had the RFC to perform light work subject to
the following limitations:

> After careful consideration of the entire record, I find that, through the date last
> insured, the claimant had the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) except she can never climb ropes, ladders or
> scaffolds; never be exposed to unprotected heights or hazardous machinery;
> occasionally climb stairs and ramps; never crawl; occasionally stoop and crouch;
> occasionally reach overhead; and frequently reach in all other directions. She is
> able to do only simple and routine tasks. *She must also be able to wear protective*
> *gloves while performing job duties*.

R. 31 (emphasis added).

Plaintiff suggests that the ALJ found Plaintiff's plastics allergy to be a severe impairment in the 2018 decision, she is mistaken. Instead, at step two, the ALJ actually found in that decision that Plaintiff's severe impairments consisted of degenerative disc disease; radiculopathy; GERD; IBS; shoulder impingement; hypertension; hyperlipidemia; an affective disorder; and anxiety. R. 29.

In the 2020 decision, the ALJ explained why Plaintiff's allergy to plastics, if any, was not a severe impairment:

> At the February 13, 2018 hearing, the claimant's representative asserted that she developed an allergy to plastic, which required removal of the PEEK cages after her lumbar fusion surgery. At that hearing, the claimant testified that she went into anaphylactic shock about two weeks after her 2014 lumbar spine surgery with burns and welts all over her body. Due to this allergy, she would be unable to hold her cell phone for too long before her hands swelled up and even her lips would swell if she drank too much water out of a plastic bottle. At the November 4, 2020 hearing, she testified that she no longer used a laptop or computer. When using her phone, she noted that she had a leather case on it and she used speakerphone when making calls. Moreover, she noted that she had to "redo my way of living," such that she did not hold any products containing plastic for too long. If she did, her "fingers swell up like Mickey Mouse." Despite these alleged effects, she indicated that she never discussed the possibility of gloves, such as cotton or non-plastic gloves, as a preventative measure. Regardless, I find that the alleged plastic allergy is nonsevere because there is no objective evidence that it causes more than minimal functional limitations in the claimant's ability to perform work-related activities during the period at issue. First, there is no conclusive objective medical evidence indicating a definitive allergy to plastic. The claimant did undergo removal of the PEEK interbody cages at L4-L5 and L5-S1 on September 4, 2015 with neurosurgeon Samuel Cho, M.D. (46F/4-5; 73F/4-7).
>
> However, review of the records does not contain a definitive conclusion that the claimant has an allergy to all plastic and/or the extent of the response to exposure that the claimant alleges. On October 29, 2014, the claimant saw allergist Jun Yang, M.D., for hives after her lumbar fusion surgery, with a denial of any swelling in her lips, hands or feet (1F/1-2). The claimant exhibited an urticarial lesion on her abdomen, and Dr. Yang indicated that it might be due to the bone stimulator contact or onset of chronic urticarial (Id.). On May 14, 2015, allergist Tina Zecca, D.O., performed an initial evaluation, where the claimant exhibited hives throughout the body (63F/35-39). Dr. Zecca diagnosed urticarial but she informed the claimant that it could be idiopathic and not necessarily secondary to her hardware (Id.). She renewed the claimant's prescriptions for Prednisone and Xyzal (Id.). On May 30,

2015, Dr. Zecca noted that the metal patch testing was negative, and she indicated that the claimant "may be allergic to the PEEK product in the cage" (63F/25-30). She reiterated that the etiology for chronic urticarial "is sometimes not found" and she renewed Xyzal (Id.). Notably, on August 3, 2015, Dr. Zecca noted that the claimant's cervical spine fusion involved a "different PEEK product," and although placement of a PEEK device on the right arm caused an area of erythema, the control on the left arm with a plastic device the same size as the PEEK device was negative (63F/17-23). On September 30, 2015, the claimant had "almost complete resolution of the hives" after removal of the PEEK cage from her lumbar spine and the examination revealed no lesions, rashes or hives. (63F/14-16). She continued Xyzal, Prednisone, levocetirizine, and clotrimazole (Id.). On December 15, 2015, the claimant complained about an inability to reduce the dose of Prednisone, but she denied any hives or swelling (63F/11-13). The examination revealed no rashes or lesions (Id.). On January 24, 2017, she returned to Dr. Zecca with reports of hives only with plastic exposure as well as some pressure exposure to plastic with occasional lip swelling (63F/4-6). The only remarkable finding on the examination was some unspecified lip swelling, and she noted, "I am wondering why she has hives from pressure or from truly plastic exposure" (Id.). At that time, Dr. Zecca asked the claimant to consider immunoglobin therapy for the chronic urticarial and use of karbinol in the evening (Id.). The claimant did not return to Dr. Zecca again until November 16, 2017, when she reported itching and swelling on the lips with plastic exposure and hives (63F/8-10). However, she "has not had any swelling" and the examination revealed purpura on the upper extremities (Id.). Notably, Dr. Zecca recommended "obtain[ing] labs on her metals and plastics if available" (Id.). From July 17, 2015 through April 21, 2017, pain management provider Adam Meyers, D.O., consistently documented her denial of hives or rashes in the Review of Systems (43F/1-18; 54F/16-17, 21-23, 26-29, 34-39, 40-88). During the period at issue, Dr. Meyers was the provider who saw the claimant most frequently (Id.).

Therefore, the evidence of record does not definitively substantiate that she has an allergy to any or all plastics. Moreover, there is no documentation of subjective complaints regarding the plastics allergy to the extent of her testimony in the treatment notes, and the clinical examinations revealed relatively minimal objective findings. Lastly, the record does not document the frequency and types of treatment expected given the claimant's allegations. Accordingly, I find that the alleged allergy to plastics is nonsevere.

R. 2550–51. To the extent that Plaintiff contends that the ALJ was bound by his findings in the 2018 decision and, therefore, that the ALJ's analysis in this regard fails to comply with the Appeals Council Remand Order, that argument is not well taken. As previously discussed, the Appeals Council vacated the 2018 decision and the ALJ was therefore authorized to consider *de novo* this issue. R. 2691–92, 2693 (directing the ALJ to, *inter alia*, "take any further action to

36

complete the administrative record and issue a new decision"); *see also Davis*, 849 F. App'x at

358; *Demaio v. Berryhill*, No. CV 15-5187, 2017 WL 4618749, at *4 (D.N.J. Oct. 13, 2017)

("Therefore, the ALJ is expected to perform a de novo review on remand [from the Appeals

Council]. A de novo determination is 'an independent determination of a controversy that

accords no deference to any prior resolution of the same controversy.'") (quoting *United States v.*

*Radatz*, 447 U.S. 667, 690 (1980)). On remand, the ALJ properly conducted a detailed

consideration of the record evidence to support his conclusions regarding any allergy to plastics

and the effects of any such allergy. R. 2550–51.

As to the merits of the ALJ's consideration of the evidence in this regard, even if the ALJ

erred in finding no definitive evidence of an allergy to plastics, he went on to explain why any

such allergy was non-severe. R. 2551. Specifically, the ALJ explained that the record evidence

did not establish "the extent of the response to exposure that the claimant alleges[,]" pointing out

that "there is no documentation of subjective complaints regarding the plastics allergy to the

extent of her testimony in the treatment notes, and the clinical examinations revealed relatively

minimal objective findings. Lastly, the record does not document the frequency and types of

treatment expected given the claimant's allegations." *Id.* (noting further that, upon examination

in January 2017, Plaintiff had only "some unspecified lip swelling" and that Dr. Meyers

"consistently documented her denial of hives or rashes" from July 17, 2015, through April 21,

2017). In crafting the RFC, the ALJ expressly stated that he had "considered all symptoms and

the extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence[.]" R. 2557. Consistent with this finding, the ALJ included

no limitation in the RFC for any allergy to plastics, including no requirement to wear protective

gloves. R. 2557–68. While Plaintiff insists that the "needed to keep the plastic allergy in the

RFC" in the 2020 decision, she concedes that there is no medical evidence that protective gloves would fail to accommodate her plastics allergy and she does not identify —nor can the Court locate—any additional functional limitations, opined by any medical source or otherwise, flowing from such allergy that the ALJ failed to include in the RFC. *Plaintiff's Brief*, ECF No. 11, pp. 18 – 21; *Plaintiff's Reply Brief*, ECF No. 18, pp. 11–13. Without more, a mere diagnosis of an allergy to plastics does not establish any functional limitations. *Cf. Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) ("A diagnosis alone, however, does not demonstrate disability.") (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act"). The Court therefore finds no error with the ALJ's consideration of Plaintiff's non-severe plastics allergy and the RFC determination. *See Davis*, 849 F. App'x at 358; *Rutherford*, 399 F.3d at 554 (providing that an ALJ need include only "credibly established" limitations); *Grella v. Colvin*, No. 3:12-CV-02115-GBC, 2014 WL 4437640, at *18 (M.D. Pa. Sept. 9, 2014) ("[T]he ALJ cannot accommodate limitations which do not exist, or which cannot be found in the medical record. No specific functional limitations were provided by any of Plaintiff's medical sources with respect to her carpal tunnel syndrome[.]") (internal citation and quotation marks omitted). In short, Plaintiff has not shown that the ALJ erred in his consideration of the functional limitations associated with Plaintiff's visual impairments or that any such error warrants remand. *See Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling

caused harm."); *Rutherford*, 399 F.3d at 553 (finding that "a remand is not required here because it would not affect the outcome of the case").

### B.      Opinion Evidence

Plaintiff also contends that the Appeals Council Remand Order "required the ALJ to apply all of Dr. Nguyen's" and "Dr. Cho's findings" "to Step 3, the RFC and hypothetical conveyed to the VE [vocational expert]." *Plaintiff's Brief*, ECF No. 11, pp. 21–22; *Plaintiff's Reply Brief*, ECF No. 18, pp. 13–14. Plaintiff argues that, "[d]espite the mandate, the ALJ failed to apply" certain findings from these medical providers, requiring remand. *Id.* Plaintiff's arguments are not well taken.

As a preliminary matter, to the extent that Plaintiff suggests that the Appeals Council Remand Order dictated the outcome of any matter in the 2020 decision, Plaintiff is mistaken for the reasons previously discussed. Notably, after vacating the 2018 decision, the Appeals Council directed the ALJ to, *inter alia*, "[f]urther consider the opinion evidence, particularly the opinions [of Dr. Nguyen and Dr. Cho] . . . pursuant to 20 C.F.R. 404.1527, and articulate those findings in the hearing decision." R. 2692. That is precisely what the ALJ did here. R. 2560–62, 2566–68. For the reasons that follow, substantial evidence supports the ALJ's consideration in this regard.

For claims filed before March 27, 2017,[13] "'[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the

---

[13] As previously noted, Plaintiff's claim was filed on August 13, 2014. For claims filed after March 27, 2017, the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources").

patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec.*, 794 F.

App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see*

*also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ

should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d

at 43 (3d Cir. 2001) (stating that a treating physician's opinions "are entitled to substantial and at

times even controlling weight") (citations omitted). However, "[a] treating source's opinion is

not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the]

case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20

C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d

Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and

inconsistent with the other evidence in the record."). "In choosing to reject the treating

physician's assessment, an ALJ may not make speculative inferences from medical reports and

may reject a treating physician's opinion outright only on the basis of contradictory medical

evidence and not due to his or her own credibility judgments, speculation or lay opinion."

*Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must

consider the following factors when deciding what weight to accord the opinion of a treating

physician: (1) the length of the treatment relationship and frequency of examination; (2) the

nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the

consistency of the opinion with the record as a whole; (5) the treating source's specialization;

and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(1)–(6). Accordingly, "the ALJ still

may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'"

*Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225

F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the

government 'may properly accept some parts of the medical evidence and reject other parts,' the government must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (internal citation omitted).

In crafting the RFC in the 2020 decision, the ALJ assigned "limited weight" to Dr. Nguyen's 2015 opinion, reasoning as follows:

> On February 23, 2015, Dr. Nguyen provided another narrative report (36F/541-550). In this report, Dr. Nguyen noted that the claimant's low back pain and radicular symptoms "remains symptomatic," and she was "*still limited in overall ROM and her endurance as she fatigues easily*" (Id.). Dr. Nguyen noted that the claimant still required use of a back brace for lumbar support and she continued to be affected in her activities of daily living (Id.).

> I accord limited weight to the February 23, 2015 opinion by Dr. Nguyen, but I have placed a restriction in the residual functional capacity for work that allows her to wear a back brace. The opinion is vague and not a specific function-by-function assessment. Furthermore, it is not consistent with the overall evidence of record. Specifically, the record documents an ACDF surgery for the cervical spine on June 28, 2007, which is almost seven years prior to the alleged onset date. During the period at issue, the record contains no significant documentation of any significant complaints regarding the cervical spine, and there are only sporadic notations of objective findings including limited ROM, tenderness and muscle spasm. Even then, the record consistently documents full motor strength, intact sensation, and unremarkable deep tendon reflexes of the upper extremities. Similarly, as for the lumbar spine, the claimant underwent a laminectomy and microdiscectomy prior to the alleged onset date. During the period at issue, she underwent a lumbar fusion procedure on September 17, 2014 with Dr. Nguyen and a subsequent removal of the PEEK cages in the lumbar spine with Dr. Cho on September 4, 2015. However, it is notable that the postoperative clinical examinations with Dr. Nguyen through the last visit on June 22, 2015 revealed full motor strength in the lower extremities,

41

grossly intact sensation, unremarkable deep tendon reflexes, and no indications or documentation regarding any gait abnormalities. On August 13, 2015, Dr. Cho noted antalgic gait with reduced ROM of the cervical and lumbar spines, but similar to Dr. Nguyen there were no significant neurologic deficits on the examination. Lastly, the record with pain management provider Dr. Meyers from July 17, 2015 through April 21, 2017 consistently revealed full motor strength in the lower extremities, and relatively intact sensory functioning except for the first dorsal web space and dorsum of the feet. *At the same time, the claimant continually reported that her pain was stable with the hydrocodone, with several notations of able to carry out "a fairly normal level of functional activity*."

R. 2566–67 (emphasis added). The Court finds no error with the ALJ's consideration in this regard. *See* 20 C.F.R. § 404.1527(c)(4); *Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) (finding that the ALJ "appropriately gave less weight" to medical opinions where, *inter alia*, the ALJ discounted a physician's opinion as "inconsistent with the record evidence[,]" including that physician's "own findings that [the plaintiff] maintained normal grip strength and intact reflexes"); *Smith v. Astrue*, 359 F. App'x 313, 316 (3d Cir. 2009) (concluding that, where the treating source's "medical opinion is contradicted by several pieces of evidence in the record and also contains internal inconsistencies, it is not entitled to the level of deference otherwise accorded to a treating physician's opinion"); *Perry v. Saul*, No. 1:19-CV-1923, 2021 WL 1701304, at *17 (M.D. Pa. Apr. 29, 2021) (finding that the ALJ "adequately discussed" the medical opinions and weight assigned to such opinions where, *inter alia*, the ALJ considered an opinion from a treating physician "but she concluded that it had little evidentiary weight due to the fact that no specific functional limitations were noted").

Plaintiff complains that the ALJ "failed to apply" Dr. Nguyen's findings that Plaintiff "[r]equires narcotic pain medication"; "[f]atigues easily"; and has a "[l]imited lumbar range of motion." *Plaintiff's Brief*, ECF No. 11, p. 21; *Plaintiff's Reply Brief*, ECF No. 18, p. 13. However, as detailed above, the Appeals Council Remand Order did not require the ALJ to accord any particular weight to any medical provider's findings. R. 2691–93. In any event, the

ALJ expressly acknowledged these findings, but nevertheless assigned limited weight to Dr.

Nguyen's opinion. R. 2566–67.[14] Plaintiff's argument, therefore, boils down to nothing more

than a disagreement with the ALJ's decision in this regard, which the Court has already

explained is supported by substantial evidence. *See Perkins v. Barnhart*, 79 F. App'x 512, 514–

15 (3d Cir. 2003) ("Perkins's argument here amounts to no more than a disagreement with the

ALJ's decision, which is soundly supported by substantial evidence."). The Court declines

Plaintiff's invitation to reweigh this evidence. *See Chandler*, 667 F.3d at 359; *Hatton*, 131 F.

App'x at 880.

Plaintiff also complains that the ALJ failed to properly consider Dr. Cho's opinion.

*Plaintiff's Brief*, ECF No. 11, p. 22; *Plaintiff's Reply Brief*, ECF No. 18, p. 13. The ALJ assigned

"limited weight" to this opinion, reasoning as follows:

> On September 22, 2015, Dr. Cho opined that the claimant could stand and/or walk
> for less than two hours, sit for less than six hours, and had unspecified limitations
> in pushing and/or pulling and "other" (46F/1-3). I accord limited weight to this
> opinion. Although Dr. Cho performed the revision lumbar fusion surgery, there is
> no longitudinal treatment relationship after this surgery, and his preoperative
> evaluation of the claimant revealed relatively minimal neurologic deficits on the
> clinical examination. Moreover, the opinion is not consistent with the overall
> evidence of record regarding the cervical and lumbar spines. Specifically, the
> record documents an ACDF surgery for the cervical spine on June 28, 2007, which
> is almost seven years prior to the alleged onset date. During the period at issue, the
> record contains no significant documentation of any significant complaints
> regarding the cervical spine, and there are only sporadic notations of objective
> findings including limited ROM, tenderness and muscle spasm. Even then, the
> record consistently documents full motor strength, intact sensation, and
> unremarkable deep tendon reflexes of the upper extremities. Similarly, as for the
> lumbar spine, the claimant underwent a laminectomy and microdiscectomy prior to

---

[14] Notably, as previously discussed, the ALJ previously explained that he fully accounted for any
lumbar (and cervical) spine impairments by "limiting the claimant to light exertion, with
occasional reaching overhead and frequent reaching in all other directions" and to "frequent
balancing, occasional stooping, crouching, and climbing ramps and stairs, and no climbing ropes,
ladders or scaffolds, with no exposure to unprotected heights or hazardous machinery. To
alleviate any symptoms of the back pain, the residual functional capacity includes the ability to
wear a back brace during work hours." R. 2562.

the alleged onset date. During the period at issue, she underwent a lumbar fusion procedure on September 17, 2014 with Dr. Nguyen and a subsequent removal of the PEEK cages in the lumbar spine with Dr. Cho on September 4, 2015. However, it is notable that the postoperative clinical examinations with Dr. Nguyen through the last visit on June 22, 2015 revealed full motor strength in the lower extremities, grossly intact sensation, unremarkable deep tendon reflexes, and no indications or documentation regarding any gait abnormalities. On August 13, 2015, Dr. Cho noted antalgic gait with reduced ROM of the cervical and lumbar spines, but similar to Dr. Nguyen there were no significant neurologic deficits on the examination. Lastly, the record with pain management provider Dr. Meyers from July 17, 2015 through April 21, 2017 consistently revealed full motor strength in the lower extremities, and relatively intact sensory functioning except for the first dorsal web space and dorsum of the feet. At the same time, the claimant continually reported that her pain was stable with the hydrocodone, with several notations of able to carry out "a fairly normal level of functional activity."

R. 2567–68. The Court finds no error with the ALJ's consideration in this regard. *See* 20 C.F.R. § 404.1527(c)(1), (4); *Brunson*, 704 F. App'x at 59−60; *Smith*, 359 F. App'x at 316.

While Plaintiff contends that the ALJ "failed to apply" certain findings made by Dr. Cho,[15] this Court has already explained in connection with Dr. Nguyen's opinion that the Appeals Council Remand Order did not compel the ALJ to assign any particular weight to any medical provider's findings. R. 2691–93. Similarly, to the extent that Plaintiff insists that the ALJ should have crafted a different RFC because of Dr. Cho's findings, substantial evidence supports the ALJ's RFC determination and consideration of Dr. Cho's opinion for the reasons

---

[15] Plaintiff contends that the ALJ "failed to apply" the following findings:

- Severe allergy to Polyethyletherketone (i.e. plastic)
- Pseudoarthrosis
- Her lumbar impairment is so severe plaintiff is incapable of even sedentary work
- Limited to less than 2 hours a day in standing and walking
- Limited to less than 6 hours a day sitting
- Weakness and numbness of the bilateral lower extremities which affect pushing and pulling in all directions. Tr. 2074-2085.

*Plaintiff's Brief*, ECF No. 11, p. 22; *Plaintiff's Reply Brief*, ECF No. 18, p. 13.

previously discussed. The Court will not reweigh the evidence. *See Chandler*, 667 F.3d at 359; *Hatton*, 131 F. App'x at 880.

Finally, Plaintiff generally asserts that "[o]nce all of the plaintiff's relevant and probative psychiatric and physical impairments and limitations are applied with specificity to the RFC and conveyed to the VE [vocational expert], the plaintiff would not be able to perform light or sedentary work and would be off task significantly greater than the 11% threshold identified by the vocational expert. Tr. 2641." *Plaintiff's Brief*, ECF No. 11, p. 22. Plaintiff's argument is not well taken. As a preliminary matter, this Court has already explained that substantial evidence supports the ALJ's decision to discount Dr. Cho's opinion that Plaintiff is incapable of even sedentary work. Plaintiff has not pointed to any other medical provider who opined that Plaintiff was so limited. Similarly, Plaintiff has not identified any medical source—and the Court can find none—who opined that Plaintiff would be "off task significantly greater than [] 11%[.]" *Plaintiff's Brief*, ECF No. 11, p. 22.An "ALJ cannot accommodate limitations that do not exist, or which cannot be found in the medical record." *Grella*, 2014 WL 4437640, at *18.

For all these reasons, the ALJ's consideration of the opinions of Dr. Nguyen and Dr. Cho do not require remand in this case.

### C.      Back Brace

In a final challenge to the RFC determination, Plaintiff complains that the ALJ impermissibly "played doctor" "by stating the plaintiff could perform unskilled light work if she wore a back brace without support from a doctor." *Plaintiff's Brief*, ECF No. 11, p. 23; *see also Plaintiff's Reply Brief*, ECF No. 18, pp. 14–15. This Court disagrees. As detailed above, the ALJ was not "playing doctor" or relying on his own lay opinion when he included the use of a back brace in the RFC. Dr. Nguyen recommended that Plaintiff wear a back brace for lumbar support.

R. 2006, 2014, 2566. Consistent with that recommendation, the ALJ added a requirement that

Plaintiff wear a back brace to the RFC. R. 2557, 2562. To the extent that Plaintiff suggests that

the ALJ must support every RFC limitation with a matching medical opinion, Plaintiff is

mistaken. As previously discussed, the ALJ is charged with determining the claimant's RFC. 20

C.F.R. § 404.1527(e), 404.1546(c); *see also Chandler*, 667 F.3d at 361 ("The ALJ—not treating

or examining physicians or State agency consultants—must make the ultimate disability and

RFC determinations.") (citations omitted). Accordingly, "[t]here is no legal requirement that a

physician have made the particular findings that an ALJ adopts in the course of determining an

RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also Mays v. Barnhart*,

78 F. App'x 808, 813 (3d Cir. 2003) ("Primarily, the ALJ is responsible for making a residual

functional capacity determination based on the medical evidence, and he is not required to seek a

separate expert medical opinion."). Notably, "the ALJ is not precluded from reaching RFC

determinations without outside medical expert review of each fact incorporated into the

decision." *Chandler*, 667 F.3d at 362. The Court is therefore not persuaded that the ALJ's

inclusion of a back brace limitation in the RFC requires remand.

 In short, for all these reasons, the Court concludes that the ALJ's findings regarding

Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the

record, as does his consideration of the opinions of Drs. Nguyen and Cho.

 For these reasons, the Court **AFFIRMS** the Commissioner's decision.

 The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42

U.S.C. § 405(g).

Date:  May 8, 2023         *s/Norah McCann King*
             NORAH McCANN KING
            UNITED STATES MAGISTRATE JUDGE